**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Victor L. Townsley, | : | Case No. 5:09-CV-2518 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| Commissioner of Social Security**,** | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the Act.  Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket Nos. 14, 20, & 21).  For the reasons that follow, the Commissioner's decision is affirmed.

**I. PROCEDURAL BACKGROUND.**

On January 31, 2006, Plaintiff filed applications for DIB and SSI alleging that he became

disabled on September 30, 2005[1] (Tr.4, 77-81). .  Plaintiff's requests were denied initially and upon

reconsideration (Tr. 4, 53-55, 57-59).  Plaintiff filed a request for hearing and on August 18, 2008

Administrative Law Judge (ALJ) Richard Staples held a hearing at which Plaintiff, represented by

counsel, and Vocational Expert (VE) Kevin Yi attended and testified (Tr. 565).  On October 10, 2008,

ALJ Staples rendered an unfavorable decision, finding that Plaintiff was not disabled under the Act (Tr.

15-28).  On August 28, 2009, the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision the final decision of the Commissioner (Tr. 6-9).  Plaintiff filed a timely complaint in

this Court seeking judicial review.

## II.  FACTUAL BACKGROUND.

A.    PLAINTIFF'S TESTIMONY.

Plaintiff, a resident of Navarro, Ohio, weighed 225 pounds.  Plaintiff lived with his spouse and

three children (Tr. 571). He earned an associate's degree in accounting and a certificate for computerized

accounting (Tr. 574).

Plaintiff served in the United States Navy for four years as a disbursing clerk.  He was given a

humanitarian discharge (Tr. 574, 589, 590).

After college, Plaintiff worked for a marketing and research company as a payroll clerk (Tr. 574).

For a "couple of months," Plaintiff was a route sales driver.  In that capacity, he loaded and unloaded

trucks and delivered boxes  that weighed up to twenty pounds to convenience stores (Tr. 575).  As a

driver for Cintas, Plaintiff was required to lift up to fifty pounds.  Additionally Plaintiff had experience

as a cook and a baker for several restaurants and/or cafeterias (Tr. 576).  Plaintiff satisfied the

---

[1]

   The SSI application was not available for inclusion in the transcript; however, a written motion to amend onset
date from September 30, 2005 to February 1, 2006 is included in the record (Tr. 4,  60).

prerequisites for the position of conductor on the railroad.  He could not meet, however,  the physical requirements  for  employment  (Tr.  577).    Plaintiff  was  last  employed   during  January  2006; consequently,  he amended the onset date of disability to February 1, 2006 (Tr. 571-572).

In January 2005, Plaintiff underwent a spinal fusion.  After the surgery, Plaintiff returned to work and  injured  his  neck.    The  pain  in  his  neck  occasionally  radiated  to  his  fingertips.    Plaintiff  had numbness in his fingertips.  At the time of injury, Plaintiff's employer believed that he could return to work with rehabilitation.  Plaintiff did not return to work as his condition deteriorated to the point that some days he could not get out of bed (Tr. 578).

During the six years that preceded the hearing, Plaintiff had undergone pain management.  The course of treatment included a series of facet blocks and injection of drugs to relieve the constant pain. At the time of hearing, Plaintiff was prescribed a pain reliever and muscle relaxant.  He supplemented the drug therapy with the application of hot compresses on the pain points.  On a typical day, Plaintiff pain registered an eight on an ascending scale of severity where ten is the most severe.  He supplemented his treatment with hot compresses (Tr. 580).

Plaintiff was undergoing similar pain therapy for his back.  He described his back pain as a nine on the ascending scale with ten representing extreme severity.  To supplement his pain management therapy, Plaintiff was prescribed a topical cream to relieve pain.  The side effects of the pain medication included fatigue (Tr. 581, 591).

In addition, Plaintiff had severe arthritis in his left foot, a tear in his tendon and a hairline fracture.  He had acute plantar fasciitis in both feet.  A podiatrist administered injections every month (Tr. 582).

Plaintiff also suffered from depression for which he was undergoing treatment by a psychiatrist

3

quarterly and taking medication twice daily.  This medication also caused fatigue.  He was particularly depressed because he could not care for his children and his young wife was responsible for their total care.  Despite these stressors, Plaintiff's psychiatrist had determined that Plaintiff was doing pretty "good" during the preceding year.  In fact, he opined that Plaintiff had only mild symptoms or some difficulty in social, occupational or school functioning (Tr. 582, 583, 584, 590, 591).

During a typical day, Plaintiff was able to care for, dress and bathe himself.  Sometimes his wife washed his back and helped him put on his shoes.  He could zip his cloths but he had to be seated to apply his socks.  His wife cleaned, emptied the trash and dusted (Tr. 584, 585, 588).  Occasionally, Plaintiff drove to the store even though he was impatient, his foot got tired and his back pain affected his maneuverability (Tr. 584).

Plaintiff had difficulty sleeping but he estimated that he could sit no longer than forty-five minutes, stand approximately forty-five minutes before the onset of back and foot pain and probably walk a block and a half before having to rest.  After resting for five or ten minutes, he could resume walking an additional block.  He estimated that he could lift approximately four pounds (Tr. 585, 586).  Plaintiff tired when climbing stairs and he could not bend, squat or kneel (Tr. 588, 589).

**B.      VE TESTIMONY**.

The VE testified that his opinions were consistent with THE DICTIONARY OF OCCUPATIONAL TITLES (DOT) and its companion publication, the SELECTED CHARACTERISTICS OF OCCUPATIONS (SCT) (Tr. 593, 594).  The VE classified Plaintiff's last job as route sales driver as a semiskilled job with a specific vocational preparation of more than one month up to and including three months.  DOT (rev. 4th ed. (1991).  The work was considered in the medium exertional level as described in DOT and as Plaintiff performed it.  His employment as a cook was a semiskilled job of the medium exertional level (Tr. 592,

593). Plaintiff's employment as a candy baker was unskilled work of the medium exertional level. The specific vocational training required to perform this job was anything beyond short demonstration up to and including one month (Tr. 593). His position of warehouse laborer was classified as an unskilled job, of the medium exertional level and specific vocational preparation which includes anything beyond a short demonstration up to and including one month (Tr. 594).

The VE described an individual of Plaintiff's age, educational background, with an ability to (1) lift and/or carry no more than five pounds frequently and ten pounds occasionally, (2) push and pull five pounds frequently and ten pounds occasionally, (3) sit for about six hours in an eight-hour workday, (4) stand and/or walk about two hours in an eight-hour workday provided he could change positions briefly every 45 minutes to stretch and if standing or walking, given an opportunity to sit for a minute or less and (5) refrain from climbing, crouching, kneeling, crawling or stooping or engaging in repetitive motion overhead. This individual could not perform Plaintiff's past relevant work (Tr. 594, 595). This individual could, however, perform work as an electronic assembler inspector, a food and drink order clerk and a surveillance monitor. In the nation, there were approximately one half million electronic assembler inspector jobs and in Ohio there were approximately 18,000 such jobs (Tr. 595). In the nation there were 2.5 million food and drink order clerk and 100,000 in the State of Ohio. There were approximately 100,000 surveillance monitor jobs nationwide and 4,000 in the State of Ohio (Tr. 596).

The second hypothetical reiterates the assumptions of the first hypothetical with the exception that the hypothetical plaintiff would be limited to simple repetitive tasks because of problems with depression. Moreover, there were concentration and focusing problems. It was the VE's opinion that this hypothetical plaintiff could not perform any of Plaintiff's past relevant work but he could still perform the work as an electronic assembler inspector, food and drink order clerk and surveillance

monitor.    Limitations to unskilled work and simple tasks would not reduce the pool of jobs (Tr. 596).

The VE responded that if Plaintiff's testimony were accepted as credible as to his limitations of sitting, standing, walking and lifting and if he then added to these limitations an assumption that the hypothetical plaintiff could only walk approximately one and a half blocks having to rest for five to ten minutes, lift no more than five pounds and sit or stand nor more than 45 minutes, the hypothetical plaintiff would be disqualified from performing a full range of sedentary work (Tr. 597-598).

Finally, the VE explained that if the hypothetical plaintiff were moderately impaired in his or her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or work week without interruptions from psychologically based symptoms, the ability to accept criticism from supervisors and the ability to set realistic goals or make plans independently of others, there would be no jobs that the hypothetical plaintiff could perform (Tr. 599, 600).

### III. MEDICAL EVIDENCE.

Dr. Tammy L. Eisentrout conducted a comparison study of X-rays of Plaintiff's chest administered on April 24 and September 2, 2003.  The lung masses showed no significant change (Tr. 199).  No new pulmonary modules were identified from the computed tomogram (CT) scan taken on September 17, 2004 (Tr. 201).

On June 8, 2004, an x-ray of the upper chest showed no acute pulmonary process (Tr. 185). However, Plaintiff's total cholesterol level was high. His good cholesterol levels were poor and his glucose levels were normal (Tr. 197).

The "spiral CT" scan of the thorax administered on June 8, 2004, showed no evidence of a

6

pulmonary embolism or aortic dissection (Tr. 183).  Plaintiff was diagnosed with mild asthma, moderate hypertension and moderate esophageal reflux on June 25, 2004.  The symptoms were treated with medication and a recommendation that Plaintiff follow  a low sodium diet (Tr. 179-180).

Dr. Suzanne O. Biggs, a physician of osteopathic medicine, conducted a "check" of Plaintiff's blood pressure levels on July 23 and September 3, 2004.  Plaintiff's hypertension was well controlled with medication (Tr. 187-191).  On September 22, 2004, Plaintiff was treated for possible tendonitis of the left shoulder (Tr. 209).  On September 29, 2004, the radiologist noted that the mild patchy infiltrate in Plaintiff's left lung was consistent with pneumonia (Tr. 217).

The results from the recording of the electrical activity produced by the skeletal muscles that was conducted on October 1, 2004 were normal (Tr. 216).  On October 6, 2004, Plaintiff's middle section of the chest cavity, heart and lungs appeared normal (Tr. 221).  The non-contrast magnetic resonance imaging (MRI) scan of Plaintiff's cervical spine showed a minimal central disc bulge at C4-C5, fairly mild disc and spondylosis at C5-C6 and mild disc bulge at C6-C7 (Tr. 222).  On October 9, 2004, Plaintiff was diagnosed with shallow and slow breathing (Tr. 224).

Plaintiff's glucose levels were elevated on November 11, 2004 (Tr. 236).

On December 8, 2004, Plaintiff's cholesterol and triglycerides levels exceeded the normal range (Tr. 245).  On December 13, 2004, Dr. Jeffrey M. Cochran diagnosed Plaintiff with advanced cervical spondylosis at C5-C6 with bilateral upper extremity radiculitis (Tr. 161-162).

On January 26, 2005, Dr. Cochran performed a cervical discectomy at C5-C6 (Tr. 163).

On July 22, 2005, the CT scans of September 2, 2003 and September 17, 2004, were compared. The tiny uncalcified lung nodules viewed in both scans were unchanged (Tr. 169).  On July 23, 2005, an abscess on Plaintiff's right thigh was lanced and left open to heal (Tr. 168).

On September 28, 2005, Plaintiff was treated on an emergency basis for left foot and neck pain (Tr. 166).

Plaintiff underwent a spinal fusion in January 2005 (Tr. 371).

On February 17, 2005, Dr. Biggs diagnosed Plaintiff with an abnormal amount of lipids (Tr. 251).

An x-ray evaluation of Plaintiff's cervical spine on April 23, 2005, showed unremarkable results (Tr. 257). On May 2, 2005, Plaintiff was treated for cervical strain resulting from a motor vehicle accident. The X-rays were negative for fracture. Plaintiff was given a cervical collar and Ibuprofen (Tr. 260, 262). Plaintiff's "bad" cholesterol levels were lower than the normal range on May 18, 2005 (Tr. 265). On July 12, 2005, Plaintiff was treated for a headache (Tr. 269).

On December 27, 2005, Plaintiff was prescribed medication designed to treat his complaints of depression (Tr. 282).

On January 19, 2006, Plaintiff complained of insomnia, shortness of breath and headache (Tr. 285). Shortly thereafter, a CT scan of Plaintiff's chest was administered. The results were negative for pulmonary embolism (Tr. 287). On or about February 22, 2006, Plaintiff was diagnosed with sleep apnea (Tr. 324).

Dr. Jeffrey Welko opined on April 20, 2006, that Plaintiff could stand for possibly two to four hours in an eight-hour workday. Plaintiff's ability to sit was unimpaired (Tr. 330). The range of motion in Plaintiff's cervical spine was moderately limited; however, the range of motion in Plaintiff's shoulders, elbows, wrists, hand/fingers, dorsolumbar spine, hips, knees and ankles was normal (Tr. 331-334).

Plaintiff was treated for head and neck pain on May 8, 2006 (Tr. 336). Plaintiff was diagnosed with cervical neck strain, right knee abrasion and a head concussion on August 17, 2006 (Tr. 372). On August 18, 2006, the results from diagnostic imaging showed mild narrowing and moderate anterior

8

osteophytes at the C6-7 interspace. There was, however, no evidence of fracture or dislocation of cervical bones (Tr. 367).

Beginning on September 13, 2006, Dr. Edward Waldo, D. C., administered interferential therapy to the cervical and lumbosacral spine, a mild adjustment to the upper cervical spine and an adjustment to the lumbosacral spine during eleven scheduled sessions. Plaintiff responded well and reached maximum medical improvement (Tr. 348-355).

The MRI of Plaintiff's spine on October 16, 2006, showed no evidence of stenosis or disc herniation (Tr. 340). On October 25, 2006, the open MRI of Plaintiff's spine showed some disc dessication at L5-S1, some loss of disc height at L4-5 and the presence of an incidental visualization of a lesion on his left kidney (Tr. 339). Mild degenerative changes at L5-SI were also noted (Tr. 356).

Dr. Wallace noted on November 9, 2006, that Plaintiff's hypertension was controlled with medication and he continued to take Prilosec for gastroesophageal reflux disease (Tr. 376). On November 27, 2006, Plaintiff was diagnosed with cervical radiculitis and cervical degenerative disc disease (Tr. 344).

The X-ray of Plaintiff's cervical spine administered on December 26, 2006, showed mild cervical spondylosis at C6-7 with an essentially normal bony spinal canal (Tr. 382).

Plaintiff underwent a series of left sided lumbar facet blocks under fluoroscopic guidance at L3-L4, L4-5 and L5-S1 on December 28, 2006 and January 4, 2007 (Tr. 406, 408).

Dr. Douglas Rank diagnosed Plaintiff with diabetes, hyperlipidemia, hypertension and obesity on February 2, 2007 (Tr. 424). On February 22, 2007, Plaintiff was diagnosed with an acute viral syndrome (Tr. 430). His cardiomediastinal silhouette and rapid influenza screens were normal (Tr. 438, 439).

9

On March 15, 2007, Plaintiff was prescribed Oxycodone to treat the pain symptoms that did not subside after the injection of the facet blocks (Tr. 445).  On April 5, 2007, Vicodin and Naprosyn were prescribed for pain relief caused by acute lumbar strain    (Tr. 460).  Plaintiff underwent a cervical epidural injection under fluoroscopy on June 12 and June 19, 2007 (Tr. 451, 453).

Plaintiff twisted his left foot on July 3, 2007.  There was no evidence of fracture or dislocation. He was treated on July 5, 2007, for a painful left foot.  The treating physician attributed the pain to the inflamation of the plantar fascia (Tr. 464).

The pulmonary function study administered on November 27, 2007, showed moderate restrictive lung disease (Tr. 503).  On November 29, 2007, Plaintiff was diagnosed with mild intermittent to mild persistent asthma.  His treating physician strongly encouraged Plaintiff to stop smoking to improve his chronic cough and shortness of breath (Tr. 513).  On November 30, 2007, no evidence of deep or superficial venous thrombosis was noted (Tr. 475).

On December 10, 2007, Plaintiff was prescribed a moderate pain reliever to treat right leg pain. The pain was attributed to right calf strain (Tr. 481).

The CT scan administered on January 5, 2008, was compared to the scan administered on December 11, 2007.  No acute cardiopulmonary process was observed (Tr. 470).  The stress test administered on January 11, 2008, was negative for ischemia by electrocardiogram standards (Tr. 472).

On January 4, 2008, Plaintiff was diagnosed with mild intermittent to mild persistent asthma. Again, Plaintiff was strongly encouraged to stop smoking to improve his chronic cough and shortness of breath (Tr. 509).  On January 12, 2008, ischemia was ruled out as a possible source of Plaintiff's chest pain (Tr. 468).

Dr. Marshall L. Chalfant, M. D., radiologist, determined that there were post-surgical changes

10

from the discectomy and fusion at C5-C6.  Specifically, degenerative changes at C6-C7 were present.
There was also mild bilateral neural foraminal narrowing at multiple levels related to degenerative spurs
(Tr. 488).

On March 12, 2008, Plaintiff's blood sugar levels were elevated (Tr. 484).  The pulmonary
function test administered on March 19, 2008, showed mild to moderate restrictive lung disease (Tr. 500).

On April 15, 2008, a pain medication was administered intramuscularly to relieve the acute pain
in the left foot.  Plaintiff stated that his high level of pain elevated his blood pressure levels (Tr. 494).

Dr. Chris Durner diagnosed Plaintiff with a depressive disorder, not otherwise specified, on April
17, 2008 (Tr. 518-520).  He conducted a follow-up in June 2008, noting that Plaintiff had a number of
psychological stressors; otherwise, he was functioning pretty well.  He increased the medication
prescribed to treat depression and prescribed a sleep aid (Tr. 516).

On July 1, 2008, Plaintiff was treated for allergic rhinitis (Tr. 528).  On April 15, 2008, Dr. Jim
Bressi, D.O. noted the elevated blood pressure secondary to pain with side effects to pain medication (Tr.
535).  On July 7, 2008, Dr. Bressi opined that the use of analgesics had been helpful for controlling pain
and maintaining physical functioning (Tr. 532).

On August 7, 2008, Dr. Christopher Turner determined that Plaintiff had moderate limitations in
his ability to understand and remember detailed instructions, carry out detailed instruction, maintain
attention and concentration for extended periods, complete a normal workday and workweek, accept
instructions and respond appropriately to criticism and set realistic goals or make plans independently
of others (Tr. 537, 538).  Dr. Turner diagnosed Plaintiff with (1) an organic mental disorder as evidenced
by the disturbance of mood and emotional instability, (2) an affective disorder evidenced by loss of
interest in all activities, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or

11

worthlessness and difficulty concentrating and (3) anxiety accompanied by motor tension and associated with depression (Tr. 542, 544, 546).  Plaintiff's degree of functional limitations in the restriction of activities of daily living, difficulties maintaining social functioning and difficulties maintaining concentration, persistence or pace was mild (Tr. 551).

On August 7, 2008, Dr. Durner continued Plaintiff's prescriptions for a sleep aid and antidepressant (Tr. 564).

Plaintiff's triglyceride levels were borderline and his "good" cholesterol levels were low when measured on August 18, 2008 (Tr. 560).

Plaintiff presented to the emergency room on September 17, 2008 for treatment of left knee pain (Tr. 554).  The pain was attributed to left sciatic radiculopathy (Tr. 556).

## IV. STEPS TO ENTITLEMENT TO SOCIAL SECURITY BENEFITS.

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.  To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

**V. THE ALJ'S FINDINGS**.

Upon consideration of the evidence, the ALJ made the following findings:

1.    Plaintiff met the insured status requirements of the Act through September 30, 2010. Plaintiff had not engaged in substantial gainful activity since September 30, 2005, the alleged onset date.

2.    Plaintiff had the following severe medical impairments that are severe in combination: degenerative disc disease of the cervical and lumbar spine, traumatic cervical, lumbar and

sacral sprains and strains, right knee sprain/strain, hypertrophy, sleep apnea and an affective disorder variously diagnosed as major depression, single episode and depression, not otherwise specified. However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3.  Plaintiff had the (RFC) to perform a range of sedentary work. Specifically, he can lift, carry, push and pull ten pounds occasionally and five pounds frequently. He can sit for six hours and stand and/or walk for two hours in a normal workday. He must be able to change position briefly for less than one minute every 45 minutes. He cannot climb, crouch, kneel, crawl or stoop. He cannot perform repetitive overhead motions with the upper extremities. He is precluded from work at unprotected heights or around dangerous moving machinery. He cannot work around workplace hazards. He cannot drive vocationally. He is limited to unskilled work only that involves no more than simple, repetitive tasks.

4.  Plaintiff is unable to perform any past relevant work.

5.  Plaintiff, a younger individual aged 18-44 with at least a high school education, was able to communicate in English.

6.  Transferability of job skills was not material to the determination of disability because Plaintiff's past relevant work was considered unskilled.

7.  Considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

8.  Plaintiff was not disabled under the Act from September 30, 2005 through October 10, 2008.

(Tr. 20-28).

## VI. STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v.*

14

*Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

**VII. DISCUSSION**.

Plaintiff argues that the ALJ failed to reflect in a hypothetical question posed to the VE, the limitations imposed by Dr. Durner and expressly accepted by the ALJ that Plaintiff was moderately

15

limited in his ability to maintain attention and concentration.  Plaintiff contends that without such limitation, the VE's testimony does not constitute substantial evidence that there is work that will accommodate a claimant with Plaintiff's limitations.

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.  *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010) (*see Howard v. Commissioner of Social Security*, 276 F.3d 235, 239, 241 (6th Cir. 2002); *see also Webb v. Commissioner of Social Security,* 368 F.3d 629, 633 (6th Cir. 2004) (though an ALJ need not list a claimant's medical conditions, the hypothetical should provide the vocational expert with ALJ's assessment of what the claimant "can and cannot do.")).

Here, the ALJ posed a second hypothetical question to the VE that included the limitations of an inability to focus and concentrate (Tr. 596).  Plaintiff's attorney also posed a hypothetical question to the VE that included limitations in the ability to concentrate.  Even with these limitations, the VE opined that the hypothetical claimant could still perform the jobs quoted.

Implicit in Plaintiff's argument is a complaint that the ALJ did not apply the special technique to determine the severity of Plaintiff's mental impairments under *Craft v. Astrue.*

In *Craft v. Astrue*, 539 F. 3d 668, 676-677 (7th Cir. 2008), the case was remanded as the ALJ gave insufficient consideration to potential limitations caused by Plaintiff's mental impairments.  The *Craft* court determined that the functional areas, rated on a five-point scale, corresponded with the severity of a mental impairment.  If the ALJ rated the area as mild or none, then generally the impairment was not considered severe.  *Id.*  Otherwise, the impairment was severe and the ALJ was required to determine whether it met or was equivalent in severity to a listed mental disorder.  *Id.*  The ALJ then had to

16

document use of the special technique by incorporating pertinent findings and conclusions into the written decision.  *Id.* (*citing* 20 C. F. R. § 404.1520a(e)(2)).  The government conceded that in *Craft* the ALJ did not apply the special technique to determine the severity of Mr. Craft's mental impairment.  *Id.*

This case is distinguishable from *Craft* in that the ALJ implicitly considered Plaintiff's symptoms, signs and laboratory findings and evaluated them in accordance with 20 C. F. R. §§ 404.1520, 416.920. The ALJ adopted Dr. Durner's opinion that Plaintiff had an affective disorder.  Further, the ALJ adopted Dr. Durner's determinations that Plaintiff's functional limitations were mild; consequently, the impairment was not considered severe.  The ALJ documented the use of the special technique to reach the conclusion about the severity of Plaintiff's mental impairment (Tr. 21-22).

Plaintiff contends that the ALJ also erred in failing to include any mental limitations in the hypothetical beyond a limitation on unskilled work with no more than simple repetitive tasks or the moderate limitations imposed by Dr. Durner.  The Magistrate concurs that the ALJ only included two of Dr. Durner's limitations–(1) the inability to focus and concentrate and (2) the ability to perform simple repetitive tasks.  However, under cross-examination, Plaintiff's counsel included in a hypothetical posed to the VE all of the limitations imposed by Dr. Durner, specifically, a moderately limited ability to: understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal work week without interruptions from psychologically based symptoms, accept instruction, respond to criticism from supervisors and set realistic goals or make plans independently of others (Tr. 537-538).  Since the ALJ declared that he considered Dr. Durner's characterizations of Plaintiff's impairments and their functional limitations in assessing RFC and ultimately disability, the Magistrate does not find that the conclusions drawn by the ALJ were unsupported by substantial evidence in the record (Tr. 24).

## VIII.  CONCLUSION

For the foregoing reasons,  the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**


/s/ Vernelis K. Armstrong
United States Magistrate Judge


Date:  February 18, 2011